# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ROBERT SELLIKEN,**

**Plaintiff,**

**-vs-**                                                    **Case No.  6:04-cv-1551-Orl-JGG**

**COMMISSIONER OF SOCIAL
SECURITY,**

**Defendant.**

_____

# MEMORANDUM OF DECISION

Plaintiff Robert Selliken ["Selliken"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for supplemental security income benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **REMANDED** to the Commissioner for further proceedings.

## I.    PROCEDURAL HISTORY

On October 29, 2001, Selliken filed a claim for supplemental security income ("SSI") benefits claiming disability as of January 1, 2001 due to a seizure disorder (with headaches and chest pain) and double vision.  R. 82, 91, 95.  His claims were denied initially, R. 49, and upon reconsideration, R. 53. On November 13, 2002, the Honorable Henry U. Snavely, Administrative Law Judge ["ALJ"], held a forty-seven-minute hearing on Selliken's claim in Daytona Beach, Florida.  R. 458 - 84. Attorney Richard A. Schwartz represented Selliken at the hearing.  R. 460.  The ALJ heard testimony from Selliken.  R. 459.

On February 21, 2003, the ALJ issued a decision that Selliken was not disabled and not entitled to benefits.  R. 356-57.  Following a review of the medical and other record evidence, the ALJ found that Selliken did not have any past relevant work.  R. 356, Finding 7.  The ALJ found that Selliken retained the residual functional capacity ["RFC"] to perform the full range of the physical exertional requirements of sedentary work.  *Id.*, Finding 11.  The ALJ found that Selliken could:  lift no more than ten pounds at a time; occasionally lift and carry objects (such as docket files, ledges, and small tools); occasionally walk and stand; sit "a good deal;" but could not stoop significantly.  *Id.*, Finding 6.  The ALJ also found that Selliken had "mild restrictions" of daily life activities; had "moderate difficulties" in daily functioning; but "seldom" had deficiencies of concentration, persistence, or pace.  *Id.* Applying the Medical-Vocational Guidelines, the ALJ concluded that Selliken was not disabled.[1] *Id.*, Finding 12.

The Appeals Council granted Selliken's request for review, vacated the ALJ's decision, and remanded the case to the ALJ on June 11, 2003.  R. 363-65.  The Appeals Council noted that the ALJ did not conduct a "function-by-function assessment of Selliken's ability to do work-related physical activities or provide sufficient rationale with specific references to evidence of record in support of the assessed limitations."  R. 363-64.  According to the Appeals Council, the ALJ's decision and the record "indicate that the claimant has a seizure disorder and long standing complaints of double vision, yet the decision does not explain why the residual functional capacity does not include

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation. Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

limitations that accommodate these problems." R. 364. In addition, according to the Appeals Council, the record suggested that Selliken had medically determinable mental impairments from significant non-exertional limitations, but the ALJ did not obtain evidence about the extent to which Selliken's limitations erode the occupation base for sedentary work. *Id.*

The Appeals Council directed the ALJ to: 1.) obtain additional evidence on Selliken's mental impairments, including a consultative mental status examination with psychological testing and medical source statements about what Selliken could do despite his impairments; 2.) further evaluate Selliken's mental impairments; 3.) further consider Selliken's RFC and provide specific references to evidence in the record supporting Selliken's limitations; and 4.) obtain testimony from a vocational expert ["VE"] to clarify the effect of the Selliken's limitations on his occupational base. R. 364. The ALJ held a second hearing on April 13, 2004 in Orlando, Florida, pursuant to the Appeals Council remand. R. 485-523. Attorney Schwartz represented Selliken at this hearing as well. R. 485. The ALJ heard testimony from Selliken and from Walter E. Todorowski, an impartial vocational expert ["VE"].

On June 22, 2004, the ALJ issued a decision that Selliken was not disabled and not entitled to benefits. R. 22. Following a review of the medical and other record evidence, including a consultative psychological examination (as directed by the Appeals Council on remand), the ALJ again found that Selliken still had no past relevant work. R. 21, Finding 7. This time, however, the ALJ found that Selliken retained the residual functional capacity ["RFC"] to perform the full range of the physical exertional requirements of light unskilled work. R. 22, Finding 11. The ALJ found that

Selliken could  lift and carry twenty pounds, and stand and walk for up to six hours in an eight-hour workday.  R. 19.

The ALJ also found that Selliken had an affective disorder with a depressed mood, but did not find that Selliken's mental condition imposed "any significant nonexertional limitations on his ability to work."  *Id.*  The ALJ solicited testimony from the VE, who (as stated in the ALJ's decision) opined that a claimant of Selliken's age, education, and RFC could perform several light unskilled jobs that exist in significant numbers in the local and national economies, including an order clerk, a ticket taker, and a ticket seller.  R. 21, Finding 6.  Applying the Medical-Vocational Guidelines, the ALJ concluded that Selliken was not disabled.  R. 22, Finding 13.

On August 16, 2004, the Appeals Council denied review.  R. 3.  On October 20, 2004, Selliken timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 1.  On October 20, 2005, Selliken filed in this Court a memorandum of law in support of his appeal.  Docket No. 19.  On December 19, 2005, the Commissioner filed a memorandum in support of her decision that Selliken was not disabled.  Docket No. 22.  Selliken's claim has been pending for more than four years, and his appeal is now ripe for determination.

## II.    THE PARTIES' POSITIONS

Selliken assigns two errors to the Commissioner.  First, Selliken claims that the Commissioner erred in failing to properly consider the VE's testimony on how Selliken's seizures would affect his ability to perform work.  Docket No. 19 at 7-8.  Second, Selliken claims that the Commissioner erred by improperly discrediting Selliken's testimony about pain.  *Id.* at 8-9.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner contends that Selliken misinterprets the VE's testimony, and that substantial evidence supports the ALJ's hypothetical questions to the VE.  Docket No. 22 at 4-5.  Second, the Commissioner argues that the ALJ properly evaluated Selliken's credibility.  *Id.* at 5-6.

## III.    **THE STANDARD OF REVIEW**

### A.    **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of

factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.     REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.   42 U.S.C. § 405(g)(Sentence Four).   The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).   This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.   *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).   A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.     REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the

district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

-7-

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2] *Id.*

## IV.  **THE LAW**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

### A.     DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right. *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

### B.     THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she

is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether

a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational

opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a

-12-

wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.     PAIN

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.   42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.     CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may

be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for

mental disorders (activities of daily living; social functioning; concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

-18-

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20

C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

## V.   **APPLICATION AND ANALYSIS**

### A.   **THE FACTS**

Selliken was born on October 26, 1973 (R. 464), and was thirty years-old on the day of the ALJ's hearing on remand on April 13, 2004.  R. 485.  He attended school until the age of seventeen, but did not finish eighth grade.  R. 464.  Selliken does not have any specialized vocational training,

but obtained his G.E.D. while in prison between 1999 and 2001. *Id.* He has no past relevant work (R. 21, Finding 7), but has worked occasionally as a security guard, disc jockey, cashier, and laundry worker. R. 378, 466, 496. Stone has not engaged in any substantial gainful activity since January 1, 2001, the alleged onset date of his disability. R. 21, Finding 1.

Selliken has seizures as a result of head trauma. The seizures first began bothering him in November 1998. R. 82. In 1999, Selliken began receiving treatment as an inmate in state prison. During an intake psychological screening by the prison, Selliken reported being depressed. R. 317. The examination revealed that Selliken was "mildly impaired" but otherwise normal, with no history of mental health disorder, no mental retardation, and no appearance of "acute mental health distress." *Id.* On February 25, 1999, Dr. Hung M. Nguyen conducted Selliken's initial physical examination, and assessed seizures, diplopia, and scoliosis. R. 311. Selliken was HIV negative. R. 314. Selliken told Dr. Nguyen that he had been taking Dilantin for seizures. According to Dr. Nguyen's notes, Selliken reported that his last seizure was a month prior to examination. R. 310. Dr. Nguyen continued Selliken on 300 milligrams of Dilantin per day for the seizures. *Id.* Dr. Nguyen also recommended an electroencephalogram (EEG) to evalute Selliken's complaints of tonic-clonic seizures. R. 302-03. The notes accompanying the March 3, 1999 EEG state that Selliken's "last generalized tonic-clonic seizure was 2 months ago." R. 302. The EEG results were normal. R. 303.

Throughout March 1999, Selliken sought outpatient mental health care at the prison. His complaints ranged from being depressed to suicidal thoughts, although, at various times, Selliken later denied that he would hurt himself. *See* R. 288-301. The doctors mainly assessed alcohol dependence, borderline personality disorder, and adjustment disorder with a depressed mood. *See, e.g.,* 290, 292,

-21-

299.  At various times, Selliken was on suicide watch at the prison.  R. 295, 289.  According to doctors' notes, Selliken was alert and clear during each medical visit, and for the most part, appeared only mildly depressed.  *Id.*  Selliken was treated with group and individual therapy.  R. 293.  On March 17, 1999, Selliken reported that he was supposed to undergo surgery the following for a brain tumor.  R. 295.  The record does not indicate when or if this surgery took place.  At the second hearing before the ALJ, Selliken testified that he had a resection of the brain and angioma while he was in prison.  R. 506-07.

On April 27, 1999, psychologists at the prison completed a "bio-psychological" assessment of Selliken.  R. 260-61.  He reported a history of seizures.  R. 260.  He also complained of double vision which, according to Selliken, began after he had surgery on his left eye at age fourteen.  *Id.*  The psychologist dignosed an Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, Antisocial Personality Disorder, and seizures.  R. 261.  Selliken appeared mildly depressed, laughed occasionally, and exhibited appropriate behavior and memory.  R. 258.  The psychologist recommended adjustment monitoring, counseling once a month, and sex offender mental health screening.  *Id.*  On May 6, 1999, during his mental health screening, Selliken again appeared mildly depressed and anxious, but had clear thoughts and an intact memory.  R. 255.

Selliken visited the prison's chronic illness clinic on May 21, 1999 complaining that he had not received his Dilantin medication for approximately three and half months.  R. 251.  Selliken reported having had one seizure during that time.  *Id.*  The doctor assessed tonic-clonic seizures, prescribed Dilantin, and scheduled a follow-up evaluation to check Selliken's Dilantin level.  *Id.*  Selliken continued to receive outpatient mental health care with similar assessments — appearance

of mild depression but with appropriate behavior, clear thoughts, and an intact memory.  R. 241; *see also*  R. 231-49.  He also continued taking Dilantin.  R. 242.

On February 4, 2000, Selliken returned to the chronic illness clinic, and reported that he did not have Dilantin for the "past several days."  R. 228.  The doctor's notes indicate that Selliken's last seizure was eight months prior to the visit.  *Id.*   Selliken was diagnosed with seizure disorder, and continued on his medications.  The doctor noted that Selliken's "medical restrictions" included: "no job with heights; no powered tools or machinery; no toxic materials or chemicals; and no live steam - hot stoves - fire." *Id.*   Selliken continued mental health treatment and group therapy.  R. 191-227.  During a visit for outpatient mental health care on July 12, 2000, Selliken was alert and oriented to all spheres.  R. 192.  His mood was dysphoric, and his speech was coherent, relevant and non-delusional.  *Id.*  The doctor diagnosed a mild increase in depression secondary to dependency issues. *Id*.

On July 21, 2000, Selliken visited the chronic illness clinic complaining that his hands shook, mainly in the mornings.  R. 191.  Selliken reported having seizures six months prior to the visit.  *Id.* Selliken complained of double vision.  He reported that his left eye has been a problem his whole life, but now Selliken complained of double vision in his right eye.  *Id.*   The doctor assessed epilepsy and esotropia.  *Id*.  The doctor noted that Selliken did not want to switch to another anti-convulsive medication as he had been taking Dilantin for awhile and felt "comfortable" with it.  *Id.*

On July 26, 2000, Selliken was seen at the mental health clinic with "mid-grade depression," as he continued to show dependency and continued difficulty establishing boundaries with family and peers.  R. 188.  On August 9, 2000, Dr. Howard Lawrence saw Selliken, and assessed dysthymic

-23-

disorder and antisocial personality disorder.  R. 183 -84.  On August 23, 2000, Selliken was less depressive, and appeared otherwise, fairly normal.  R. 182.

On October 13, 2000, Selliken visited the prison clinic complaining of a rash on his face from shaving.  R. 179.  He also reported that his last seizure was eight months prior to the visit.  *Id*.  The doctor assessed seizure disorder and recommended that Selliken continue taking Dilantin.  *Id.*  On April 28, 2001, Selliken visited the prison clinic for an evaluation of his Dilantin levels.  R. 174.  The notes indicate that his last seizure was six and half months prior to the visit.  The doctor continued Selliken on Dilantin.  *Id.*

On October 29, 2001, Selliken filed his application for SSI, claiming disability as of January 1, 2001 due to a seizure disorder (with headaches and chest pain) and double vision.  R. 82, 91, 95.  Selliken stated that he has seizures every six to eight weeks; he also noted that he had one seizure in the previous three months and two seizures in the previous six months.  R. 98.  In addition, Selliken reported experiencing pain with each seizure, stating that he had headaches, that his "whole body [felt] weak, and that he experienced chest pain that felt "like a heart attack." R. 95.  Selliken reported taking Dilantin three times a day for the seizures, but then stated that he takes all three doses at the same time because otherwise, he "get[s] sick."  R. 98.  Selliken noted that he took two Tylenol per day for the pain which "stop[s] headaches."  R. 95-96.

On December 17, 2001, Selliken had a seizure, and was taken to the emergency room at Memorial Hospital in Ormond Beach, Florida.  R. 119.  Selliken's girlfriend reported that during the one to two-minute seizure, Selliken was unresponsive and "shaking all over."  *Id*.  She also reported that Selliken missed recent dosages of his seizure medication, and that he recently drank alcohol.  *Id.*

His alcohol level was 235, but Selliken was otherwise normal. R. 119-20. The physician assessed seizure and alcohol intoxication. R. 120. The physician discharged Selliken, noting that he was awake, alert, and stable. *Id.*

On December 21, 2001, Dr. Craig Miller treated Selliken for a sore throat. R. 160. Selliken also reported that he tested positive for HIV while in prison and that he had a seizure disorder. *Id.* Selliken stated that his last seizure was four days prior to the visit, and that he did not know how long the seizure lasted. *Id.* Selliken reported that he had experienced convulsions, had a history of grand mal seizures, and that he was taking anti-seizure medication. R. 162. Selliken denied "visual disturbance, gait disturbance, incoordination . . . dizziness, and headaches." *Id.* Dr. Miller noted that Selliken was cooperative and speaking normally. *Id.* Dr. Miller diagnosed epilepsy that was "[u]nspecified . . . without mention of intractable epilepsy" and HIV positive status. *Id.*

On January 9, 2002, Selliken saw Daniel A. Warner, upon referral from Dr. Miller for an HIV-related evaluation. R. 121. Dr. Warner conducted a physical examination, noting that Selliken was not in "acute distress," had no "neurological deficits," and exhibited "affect and behavior appropriate for situation." R. 122. Dr. Warner's concluded that Selliken was asymptomatic for HIV. *Id.* Dr. Warner discussed HIV treatment, and planned a follow-up visit for further evaluation. Selliken reported taking 300 milligrams of Dilantin daily. *Id.* Selliken also reported having double vision since undergoing ocular surgery as a child. *Id.* On January 22, 2002, Selliken tested positive for Hepatitis A. R. 124.

The state agency physician completed a Physical Residual Functional Capacity Assessment on February 13, 2002. R. 128-35. The physician opined that Selliken could: lift or carry twenty

pounds occasionally and ten pounds frequently; stand, walk, or sit for a total of six hours in an eight-hour workday; and push or pull without limitation.  R. 129.  The physician further opined that Selliken had no manipulative and communicative limitations; occasional balancing limitations; and frequent climbing, kneeling, crouching, and crawling limitations.  R. 130, 132.  The only visual limitation the physician noted was that Selliken had "limited" depth perception.  Selliken should also avoid concentrated exposure to hazards, such as machinery and heights.  R. 132.  The physician noted that Selliken had double vision since childhood, was HIV positive, and had seizures when intoxicated. R. 129.  The physician also stated that Selliken was non-compliant with seizure medication.  R. 130. He concluded that Selliken's symptoms were due to a medically determinable impairment, but also that the severity of Selliken's symptoms were disproportionate to what would be expected with that impairment.  R. 133.

In requesting reconsideration of the denial of SSI on February 20, 2002, Selliken reported that he had two seizures during the previous three months, and that his seizures were occurring more often than they had been when he first filed his claim.  R. 99.  On February 24, 2002, Selliken visited the emergency room at  Halifax Medical Center, complaining of seizures that began thirty minutes before his arrival.  R. 136.  He was seen by Dr. Peter Springer who noted that Selliken had tonic-clonic behavior on his way into the hospital, but "when we got him to a bed, he woke up immediately and started talking, making sense."  *Id*.  Dr. Springer diagnosed seizures, a subtherapeutic Dilantin level (his Dilantin level was less than 2.5), alcohol intoxication (Selliken reported that he had be drinking that night, and that he had four "pitchers"), and seizure disorder by history ( Selliken reported that his last seizure was three months prior).  R. 136 - 37.

Selliken was otherwise physically stable; a CT scan of the head showed no acute intracranial abnormalities. *Id.* Selliken reported that he stopped taking his Dilantin after he started taking his HIV medication, and that Dr. Warner, his "HIV doctor," told him to stop taking Dilantin. R. 137. Selliken received small doses of Dilantin and Valium. Dr. Springer discharged Selliken, telling him to take his Dilantin until he saw Dr. Warner or Dr. Miller (Selliken's neurologist) and to stop drinking alcohol. *Id.* Selliken's "aftercare instructions" again warned Selliken that his seizure occurred because his Dilantin medication level was "too low," and that "[t]oday in the Emergency Department we found no new cause of seizures." R. 140, 149.

Selliken saw Dr. Warner on March 4, 2002 as a follow-up visit for recommendations on his HIV infection. R. 334. Selliken reported having a seizure after he stopped taking Dilantin. *Id.* Dr. Warner assessed a seizure disorder, and left ear cellulitis. R. 335. He stated that Selliken had "[r]ecurrent seizure secondary to noncompliance with Dilantin therapy." *Id.* He also assessed an HIV infection, but noted that Selliken's test results were normal and suggested that Sellkin was not HIV positive. *Id.*

Selliken returned to the emergency room at Halifax Medical Center on March 19, 2002, this time with complaints of insect bites on his neck. R. 152. His neck was red and swelling. Selliken was prescribed antibiotics and told to clean his wounds. *Id.* On April 4, 2002, Selliken visited Dr. Miller as a follow-up to his March 19, 2002 hospital visit. R. 158. Selliken reported his emergency room visit for the seizure, but told the doctor that since he started taking brand-name medication (Dilantin), he "has been fine since." *Id.* Dr. Miller noted that during this visit, Selliken was cooperative, able to communicate with "normal speech," and appeared well-developed and well

nourished.  *Id.*  Dr. Miller diagnosed was epilepsy, HIV, and neck wounds, without complications.

R. 159.  Dr. Miller also wrote a letter addressed "to whom it may concern" that because Selliken was

taking 100 milligrams of Dilantin three times a day, Selliken should not drive, drink alcohol, operate

heavy machinery, be exposed to sunlight for long periods and should not have extreme altitude

changes.  R. 157.

On April 8, 2002, Selliken went to the emergency room Halifax Medical Center because he

had a seizure.  R. 163.  He told the hospital that he drank a pitcher of beer that night, noting that he

"knows that [drinking] interferes with his seizure medicine."  *Id.*   He was alert and complied with

instructions without any difficulty.  *Id.*  His Dilantin level was less than 2.5.  R. 164.  He was given

Dilantin and Thiamine intravenously, and discharged.  *Id.*  The doctor diagnosed seizure disorder,

acute alcohol intoxication, and noncompliance with prescribed medication.  *Id.*  He was again warned

against consuming alcohol.  R. 166.

In forms for the Office of Disability Determinations, Selliken reported that his daily activities

include doing the dishes and taking out the trash.  R. 106.  He also described problems concentrating

when he is "upset" and stated that he "get[s] sidetrack[ed]" easily when doing a task or chore.  *Id.*

He stated that he does not have any difficulties dealing with others or routine social activities.  *Id.*

On November 13, 2002, Selliken testified before the ALJ at his SSI hearing.  R. 459.  Selliken

stated the he underwent brain surgery for a tumor just before he was released from prison in 2001.

R. 467.  He stated that he took Dilantin, Phenobarbital, and Tegretol while in prison, and that he had

seizures every other week, even while on the medication.  R. 468.  Selliken stated that after his

surgery, he had seizures less frequently — approximately twice a month.  R. 469-70.  He then

reported that he was taking Dilantin and migraine medication, as prescribed by Dr. Miller, and that he has had seizures approximately eight times in the two years since he was released from prison. R. 472. Selliken also complained of double vision, which started in his left eye at birth, but has developed in his right eye as well. *Id.* He complained of headaches and dizziness, mostly because of his double vision, testifying that the pain in his head "[f]eels like I'm being banged in the head with a baseball bat." R. 473. He also confirmed that he was not HIV positive, although he falsely tested positive while in prison. R. 475.

On December 25, 2002, Selliken had a seizure and returned to the Halifax Medical Center emergency room. R. 346. He reported "drinking heavily tonight," but stated that he had been taking his Dilantin "correctly." *Id.* His Dilantin level was less than 2.5, and the examining doctor noted that Selliken was "obviously noncompliant on his [D]ilantin." R. 347. The doctor diagnosed seizure disorder with "noncompliance to medicines" and "alcohol intoxication/abuse." *Id.* On December 29, 2002, Selliken returned to Halifax Medical Center as a follow-up to his emergency room visit. R. 345, 347. Selliken complained of pain around his ribs after falling during a seizure. R. 342. X-rays of his chest and ribs were normal. R. 343- 44.

On April 26, 2003, Selliken visited the emergency room at Halifax Medical Center for complaints of "seizure activity and alcohol." R. 395. Selliken was diagnosed with seizure disorder and acute and chronic alcohol intoxication. R. 394. A CT scan of the brain was mainly normal. R. 395. Selliken was treated with Dilantin and Thiamine, and was told to take Dilantin medication as directed and to see Dr. Miller in two weeks to check his Dilantin level. R. 394.

One month later, on May 26, 2003, Selliken returned by ambulance to the Halifax Medical Center emergency room with the same problem. R. 392. He reported drinking alcohol instead of taking Dilantin medication. *Id.* His alcohol level was 276, and his Dilantin level was less that 2.5. *Id.* On his arrival, Selliken was awake and alert. He was responsive, but slurred his speech and smelled like alcohol. *Id.* The doctor diagnosed seizure disorder and alcohol intoxication. R. 393. Selliken was given Dilantin intravenously for one hour, was instructed to have Dr. Miller check his Dilantin level in one week, and was discharged. *Id.* Two days later, on May 28, 2003, Selliken returned to the emergency room complaining of bilateral flank pain after, as Selliken reported, his friend punched Selliken repeatedly in the ribs. R. 387. The doctor diagnosed multiple contusions, and gave him pain medication. *Id.*

The Appeals Council vacated the ALJ's decision, and remanded the case to the ALJ on June 11, 2003. On September 6, 2003, Selliken had a seizure and went to the emergency room at Halifax Medical Center. R. 429. Selliken claimed that he had been taking his Dialantin medication, but admitted that he "missed a few doses earlier in the week" and that he drank four or five beers that evening. *Id.* His Dilantin level was less 2.5. *Id.* The doctor diagnosed seizure disorder and "apparent noncompliance." *Id.* The doctor also gave Selliken one gram of Dilantin, and "stressed" that he not drink alcohol. *Id.*

On November 18, 2003, Dr. J. Jeff Oatley examined Selliken pursuant to the Appeals Council remand, and completed a psychological evaluation and medical source statement on Selliken's ability to do work. R. 404. Selliken reported suffering from seizures, a small brain tumor and double vision. *Id.* On the Wechsler Adult Intelligence Scale, III, Selliken had a Verbal IQ of 69, Performance IQ of

-30-

69, and a Full Scale IQ of 66.  R. 405.   According to Dr. Oatley, the test scores were invalid because Selliken gave up quickly on many of the tests.  R. 406.  Dr. Oakley dubbed the test results a "fake bad," stating that Selliken had "such a strong negative self-presentational strategy that all clinical scales were elevated and no additional interpretations can be made."  *Id.*  Dr. Oatley noted that Selliken was easy to understand, appropriately dressed, and able to complete three hours of testing with only one cigarette break.  R. 405.

Dr. Oatley diagnosed: borderline intellectual functioning as indicated by an individually administered intelligence test and adaptive behavior; an antisocial personality disorder; malingering; alcohol dependence; and according to his review of Selliken's medical records seizure disorder, HIV infection, and possible hepatitis. R. 406.  Dr. Oatley opined that Selliken understood the value of money but "had difficulty correctly computing simple mental purchases."  *Id.*  According to Dr. Oatley, Selliken had no difficult understanding, remembering, and carrying out short, simple instructions.  R. 402.  Selliken, however, would have slight difficulty understanding, remembering, and carrying out detailed instructions and slight difficulty making judgments on simple work related decisions.  *Id.*  Dr. Oatley opined that Selliken's impairment did not affect his ability to respond appropriately to supervision, co-workers, and work pressures in a work setting.  R. 403.

Following the Baker Act procedures for involuntary hospitalization, the police brought Selliken to the emergency room at Halifax Medical Center for an "overdose" on January 7, 2004.  R. 422. Selliken stated that he was upset about an argument and breaking up with his girlfriend, and took twenty-seven or twenty-eight Dilantin tablets, "washed it down with a half glass of Jim Bean [whiskey]," and vomited immediately afterwards.  *Id.*  A physical examination revealed that Selliken

-31-

was not in acute distress, and was "conscious, alert, and oriented." *Id.* His Dilantin level was 15, and his alcohol level was 1. R. 423. A urine drug test was negative. *Id.* Selliken was treated with activated charcoal for the overdose. *Id.*

Selliken went to ACT Corporation on January 8, 2004 for a pyschological evaluation pursuant to the involuntary hospitalization procedures. R. 438. Leo Salter, a clinical psychologist, reported that Selliken appeared to lack anger, anxiety, or depression. *Id.* Selliken's intellectual ability was average, and he showed no impairment of attention span, abstract, thinking, or calculation ability. Also, his memory and concentration were "good." *Id.* His Global Assessment of Functioning ("GAF") was between 71 - 80. R. 439. Salter saw no indication of thought or mental disorders, and determined that Selliken did not meet the criteria for involuntary psychiatric treatment. *Id.* Selliken refused further outpatient treatment, and left the hospital. *Id.*

Selliken went to Halifax Medical Center on January 15, 2004 complaining of ankle pain. According to Selliken, a side-view mirror of a car had struck him on the hip while he was walking. R. 415. His ankle showed some swelling, and the dorsum of his foot was tender. *Id.* X-rays of Selliken's knee, ankle, and foot were normal. *Id.* He exhibited the full range of motion of the upper and lower extremities, and could flex and extend at the hips. *Id.* The diagnosis was a motor vehicle accident and left knee and ankle strain. *Id.* The doctor recommended ice, elevation, an ankle wrap, crutches, and pain medication. R. 416.

On February 10, 2004, Selliken was seen at Halifax Psychiatric Center for an emergency evaluation. R. 408. His friend reported that Selliken attempted suicide by taking medications, including Dilantin. *Id.* He reported taking his amiodarone, an antihypertensive, and eighteen of his

Dilantin dosages, and then drinking alcohol.  R. 413.  Selliken denied thoughts of suicide.  *Id.*  The

doctor assessed depression and seizure disorder, and recommended that Selliken follow-up with his

primary care provider and undergo a psychiatric evaluation.  R. 414.

On February 22, 2004, Selliken called his father and told him that he "didn't want to live

anymore."  R. 433.  After being found in his home smelling of alcohol and appearing unresponsive,

Selliken was admitted to the emergency room at Halifax Medical Center with a "possible drug

overdose, rule out suicide attempt with acute exacerbation of seizure disorder."  *Id.*  He was lethargic,

and could not report any significant medical history.  R. 434.  Selliken also exhibited mild respiratory

distress.  *Id.*  Selliken's Dilantin level was less than 0.1, and his serum alcohol level was 211.  The

doctor's notes indicate that at some point during his emergency room stay, Selliken had tonic-clonic

seizure activity.  R. 435.  He was given Dilantin and Thiamine intravenously.  *Id.*  The doctor assessed

possible drug overdose, "acute exacerbation of seizure disorder with apparent noncompliance with

Dilantin therapy," depression, and a history of brain tumor.  *Id.*

Selliken was admitted to the Intensive Medical Care unit for close observation.  *Id.*  The

following day, Dr. James T. Moore saw Selliken, and recommended that Selliken be discharged.  R.

431-32.  Selliken appeared alert and oriented, and denied any suicidal or homicidal thoughts.  R. 431.

Selliken admitted that he had not taken a few doses of Dilantin, took "a few extra," and was drinking

alcohol the day before.  *Id.*  Dr. Moore concluded that the overdose was unintentional, and that

Selliken had "rather limited psychological, economical and intellectual resources."  *Id.*  Selliken did

not want counseling or substance abuse treatment.  *Id.*

Selliken testified before the ALJ at the hearing after the Appeals Counsel remand.  R. 486.

He stated that he could read and write, but had trouble because of his double vision.  R. 494.  He also

complained that the Dilantin affected his ability to work because it made him "sleepy."  R. 498.  He

tried to work at a Wendy's restaurant the previous year, but was fired less than a month after he started

because he was "too slow."  R. 500.  He also stated that he was fired from a security guard position

because he had a seizure.  R. 500-01.  Selliken testified that he has seizures approximately once a

month even when he takes Dilantin.  R. 501, 522.

### B.    THE ANALYSIS

Selliken makes  two arguments regarding error by the Commissioner.  First, Selliken claims

that the ALJ improperly credited the VE's ambiguous testimony that, despite his seizures, Selliken

could perform other work that exists in the national economy.  Second, Selliken claims that the

Commissioner improperly discredits his testimony about pain.  *Id.* at 8-9.

### 1.    The ALJ's Consideration of the VE's Testimony

Selliken challenges the ALJ's finding that Selliken could perform other work that exists in the

national economy.  Docket No. 19 at 7-8.  Specifically, Selliken argues that the VE never

unequivocally opined that other work exists in the national economy for a person with Selliken's

seizure disorder, a non-exertional impairment.  *Id*.  Selliken therefore concludes that the

Commissioner failed to meet her burden of proving that Selliken could in fact perform other work that

exists in the national economy.  The Commissioner contends that Selliken misinterprets the VE's

testimony, and that she did indeed meet her burden of proof because the ALJ's hypothetical questions

to the VE accurately described Selliken's limitations.  Docket No. 22 at 4-5.  Selliken is correct.

The ALJ found that Selliken retained the residual functional capacity ["RFC"] to perform the full range of the physical exertional requirements of light unskilled work. R. 22, Finding 11. Also, the ALJ found that Selliken could lift and carry twenty pounds, and stand and walk for up to six hours in an eight-hour workday. R. 19. The ALJ also found that Selliken had an Affective Disorder with a Depressed Mood, but did not find that Selliken's mental condition imposed "any significant nonexertional limitations on his ability to work." *Id.* According to the ALJ, the VE opined that a claimant of Selliken's age, education, and RFC could perform several light unskilled jobs that existed in significant numbers in the local and national economies, including an order clerk, a ticket taker, and a ticket seller. R. 21, Finding 6. Directly applying Medical-Vocational Rule 202.20 based on Selliken's exertional capacity for light work, age, education, and work experience, the ALJ concluded that Selliken was not disabled. R. 22, Finding 13.

Selliken is correct that the ALJ inaccurately cited the VE's opinion. During the hearing, the ALJ described a claimant with moderate physical limitations (basically those for light work activity), some mental limitations, and certain specific limitations: epilepsy with seizures of unknown frequency, double vision that was not severe, and an adjustment, depressive, or mood disorder. R. 514-15.[3] The VE responded that he needed to know the frequency of the seizures and the impact of

---

[3]The VE considered an individual of Selliken's background and "vocational profile," who "suffers from epilepsy with seizures, the frequency of which is unknown and which is being treated with Dilantin with some side effects"; who has problems with double vision, which resulted in "some difficulty in dealing with fine detail" and reading; who complained of an "adjustment or depressive disorder, mood disorder"; and who had the following limitations (as stated by the ALJ at the hearing):

> could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about six hours in an eight hour work day, sit for about six hours in an eight hour work day with unlimited pushing and/or pulling except as shown for lifting and carrying . . . the ability to occasionally climb, balance, stoop, kneel, crouch, crawl . . . no established manipulative limitations . . . visual limitation would be the double vision problem, which would not seen to be overly severe because he is able to take care of his own personal needs and so forth . . . [o]nly slight limitations in

the blurred vision in order to give an opinion.  R. 515-16.  The ALJ clarified that the seizures could

occur at any time, except that they would not occur more than two or three times during a thirty-day

period.  The ALJ also told the VE that the double vision did not "severely" impact the hypothetical

claimant's ability to work, except that "you [the VE] might not want to place him in some sort of a

fast paced activity."  R. 516.  The VE responded that jobs "possibly" exist in the national economy

that Selliken could perform, identifying positions involving sedentary work activity, such as an order

clerk and an information clerk, and positions involving light unskilled work activity, such as a ticket

taker and a ticket seller.  R. 516-17.[4]

The Commissioner argues that the VE later clarified his testimony (regarding what he meant

by "possibly") by stating that the claimant's ability to work would only be affected if the claimant had

seizures as frequently as daily or once a week.   Docket No. 22 at 5.   The Commissioner's

characterization of the VE's testimony is inaccurate.  The VE testified that he answered "possibly"

because he was uncertain about "the seizure situation."  R. 517.  While the VE did state that "what

[he was] saying" applied to a claimant who had seizures every day or once a week, he also testified

---

handling detailed instructions and carrying them out.  To make judgments in simple work related
decisions . . .

R. 514-15.

[4]The ALJ asked:

All right, if we said the seizures may occur at any time but they are not of listing level severity, that is
they don't occur more than two or three times in a 30 day period and they – the double vision is not
something that seems to have impacted severely upon his ability to work except at Wendy's where he
proved to be a little slow so that you wouldn't want to place him in some sort of a fast paced activity.
With those limitations, would there be jobs that exist in the national economy that he could perform?

R. 516.  The VE responded, "**Possibly**, Your Honor."  *Id.* (bold emphasis added).  The VE next listed examples of
sedentary and light jobs that exist in the local and national economies.  R. 516-17.

that the employers for the jobs he mentioned might not tolerate a seizure on the job, and might fire the claimant if he had a seizure during work.[5]  *Id.*  Later, the VE testified that if the claimant were also slow in computing numbers, this limitation could affect the claimant's ability to work.  R. 521.  He then further clarified (as a summary of his testimony) that "based on the factors that I had when we're talking about seizures and side effects, yes, these could affect employment."[6]  *Id.*

The ALJ properly determined that Selliken did not have any past relevant work.  R. 21, Finding 7.  The burden, therefore shifted to the Commissioner to show that there was other work in the national economy that Selliken could perform.  As directed by the Appeals Council, the ALJ obtained testimony from a VE in making that determination.  R. 20-21.  The Commissioner did not meet that burden by proving only that jobs "possibly" exist in the national economy that Selliken could perform.[7]

---

[5] Selliken's attorney asked the VE why he answered that jobs could "possibly" exist, and the VE explained that it was "[b]ecause I'm not sure about the seizure situation."  The VE then stated, "If he has a seizure every day or once a week, it could impact employment, that's what I'm saying."  Selliken's attorney next asked, "Would any of these employers tolerate a seizure on the job?"  The VE answered, "Maybe not."  The VE then stated that it was true that if the claimant had a seizure on the job with these employers, "they could let him go."  R. 517.

[6] Selliken's attorney asked the VE about the side effects of the Dilantin: "I think you testified that Wendy's let him go because he was slow or just couldn't keep up due to the side effects of the Dilantin, would that influence your testimony?"  The VE answered, "It could if he was slow computing, yes, it could affect his work."  The attorney next queried, "So, to summarize your testimony it is somewhere between – it is somewhere between possible and it could, you're not sure?"  The VE responded, "Well, based on the factors that I had when we're talking about seizures and side effects, yes, these could affect employment."  R. 520-21.
The ALJ then stated that he had "no credible testimony" about the frequency of Selliken's seizures, asking, "Frequency?  What's your frequency from his testimony just with asking – from his testimony?"  R. 521.  Selliken's attorney re-examined Selliken: "when you're taking your medication compliantly as you should, do you still have seizures?"  Selliken answered: "I testified I had them once a month even when I'm on my medicine."  R. 522.

[7] The ALJ states "In light of the testimony of the vocational expert, I must conclude that . . . Selliken is capable of making a successful adjustment to work that exists in significant numbers in the national economy."  R. 20.  The ALJ does not, however, explain why the VE's testimony that jobs "possibly" exist that Selliken can perform compels such a conclusion.

Absent clear testimony from the VE, the ALJ did not fully and fairly develop the record on

Selliken's vocational opportunities.  The ALJ's inconsistent conclusions that Selliken's limitations

are not severe enough to preclude him from performing a "significant range" (R. 20) or the "full

range" (R. 22, Finding 11) of light unskilled work are not supported by substantial evidence.  *See*

*Allen*, 880 F.2d at 1201.  First, the ALJ completely ignored all limitations related to seizures.  The ALJ

states that Selliken's seizures would be well-controlled if he did not drink and took his medication,

but does not cite to any evidence that Selliken would *never* have seizures.  Every doctor in the record

diagnosed Selliken with epilepsy or a seizure disorder.  No medical opinion in the record states that

Selliken, taking proper medication, would never have seizures.

Selliken's medical record strongly suggests that non-compliance and alcohol consumption

cause most of his seizures.  The ALJ, however, allows no possibility that Selliken will have an

occasional seizure, and does not accomodate the limitations imposed by such seizures.  Further, the

ALJ never addresses Selliken's complaints of double vision, and does not accomodate related

limitations.  As with his seizures, Selliken had a long-standing history of complaints of double vision,

with some doctors noting that he exhibited esotropia.

Third, the ALJ failed to explain why he disregarded Dr. Oatley's opinions[8] that Selliken had

an antisocial personality disorder (R. 406); that Selliken had difficulty correctly computing simple

mental purchases (*id.*); that Selliken had borderline intellectual functioning that impaired his ability

---

[8] In fact, the ALJ purported to rely on all of the medical opinions of the treating and consultative doctors (including Dr. Oatley), as well as the non-examining state agency physicians in making this consideration.  R. 19-20.  The ALJ obtained Dr. Oatley's opinion pursuant to the Appeals Council directive that the ALJ obtain additional evidence.  The Appeals Council required the ALJ to further evaluate Selliken's mental impairments, and to obtain a consultative mental status examination with psychological testing and medical source statements about what Selliken could do despite his mental impairments.

to carry out detailed instructions (R. 402); and that Selliken would have slight difficulties understanding, remembering, and carrying out detailed instructions and making judgments on simple work related decisions (*id.*).   The ALJ did not include any mental limitations other than an affective disorder with a depressed mood, and instead found that Selliken did not have any significant non-exertional limitations on his ability to work.   The ALJ never adequately explained why these limitations do not limit the range of work activity Selliken can perform.   The only time the ALJ even discussed the limitations in relation to Selliken's vocational opportunities were in the questions posed to the VE (to which the VE responded equivocally).   The Commissioner has not met her burden of proof because the ALJ did not develop a full and fair record regarding the vocational opportunities available to Selliken.

### 2.     The ALJ's Consideration of Selliken's Pain Testimony

Selliken also claims that the Commissioner erred by failing to articulate good grounds to discredit Selliken's testimony about his pain.   Docket No. 19 at 8-9.   More specifically, Selliken contends that the ALJ erred in using Selliken's daily activities to discredit Selliken's complaints of pain.   *Id.* at 9.   The Commissioner counters that Selliken "oversimplifies the ALJ's analysis, completely ignoring several pages of discussion regarding Plaintiff's credibility."   Docket No. 22 at 5.   The Commissioner is correct.   The ALJ articulated specific and adequate reasons for discrediting

Selliken's testimony about pain.[9]  The Court will not disturb the ALJ's clearly articulated credibility finding, but will remand for the reasons stated above.

## VI.    **CONCLUSION**

This case is therefore **REMANDED** to the Commissioner pursuant to Sentence Four to allow the Commissioner to reevaluate the evidence, to explain the basis for her decision, and to hold such further proceedings as she may be advised.  The Clerk shall enter judgment in favor of Plaintiff and close the case.

**DONE AND ORDERED** this 24th day of February, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV

---

[9]In the decision, the ALJ states:

I find that the claimant's subjective complaints are not fully credible considering the claimant's own description of his activities and lifestyle, the degree of medical treatment required, discrepancies between the claimant's assertions and information contained in the documentary reports, the claimant's demeanor at [sic] hearing, the reports of the treating and examining practitioners, the medical history, and the findings made on examination.

R. 19.

Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable Henry U. Snaveley
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817